UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

In re:

CNB INTERNATIONAL, INC.

                Debtor,             Case No. 99-11240 B

CNB INTERNATIONAL, INC. LITIGATION TRUST,

             Adversary Proceeding
       Plaintiff-Appellee-   Case No. 01-1193B
        Cross Appellant,

     vs.

LLOYDS TSB BANK plc,          DECISION AND ORDER
                   08-CV-774A
       Defendant-Appellant-
        Cross-Appellee.

## INTRODUCTION

This appeal concerns the liability of Lloyds TSB Bank plc ("Lloyds") for
funds it received as the result of a constructively fraudulent conveyance in 1996.
United States Bankruptcy Judge Carl L. Bucki determined that Lloyds was liable
to the CNB International, Inc., Litigation Trust (the "Trust") in the amount of
$10,639,000, plus interest computed at a federal rate totaling $2,372,526.14.
CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.), 393 B.R. 306 (Bankr. W.D.N.Y.
2008). For the reasons set forth below, Lloyds' liability is affirmed on alternate

grounds, and the case is remanded to Bankruptcy Court for a calculation of damages and other determinations consistent with this opinion.

## BACKGROUND[1]

The debtor in this case, CNB International, Inc. ("CNB"), was formed for the purpose of acquiring the assets of three entities: Clearing-Niagara, Inc. ("Clearing-Niagara"), E.W. Bliss Company ("Bliss"), and Enprotech. CNB was formed by Timothy Kelleher, who served as the Chairman and Chief Executive Officer of Verson plc ("Verson"). Verson was the ultimate corporate parent of Clearing-Niagara.

Since 1985, Verson maintained a credit relationship with Lloyds. Sometime around mid-1994, Lloyds and Verson realized that Verson's outstanding loans from Lloyds were significantly undersecured. To remedy the problem, Verson proposed to sell its North American assets through an initial public offering. To obtain bridge financing necessary to implement the offering, Verson caused Clearing-Niagara to pledge all of its assets to Lloyds. In exchange, Lloyds agreed to provide a $10 million bridge loan to Verson. Clearing-Niagara received none of the proceeds of that loan even though it pledge all of its assets as collateral. As security for the Loan, Lloyds obtained a

---

[1] The Bankruptcy Court's opinion contains a detailed and thorough recitation of the facts. Only those relevant to this appeal are repeated here.

priority security interest in all of Clearing-Niagara's assets, second only to a security interest held by Marine Midland Bank.

The initial public offering never materialized. Instead, Mr. Kelleher (Verson's CEO) proposed to form a new corporation – CNB – for the purpose of acquiring the assets Clearing-Niagara, Bliss and Enprotech. In order to purchase the assets of those three entities, CNB secured a term loan in the amount of $38 million from AT & T Commercial Finance Corp. ("AT&T"); a revolving credit facility in the amount of $25 million from Marine Midland Bank, N.A. ("Marine Midland"); and a further loan of $7,313,500 from an entity in which Kelleher and his wife were among the partners. As security for its revolving credit facility, Marine Midland received a first priority lien in all inventories, accounts and related contracts of CNB. AT&T received a first priority lien on all other tangible and intangible assets of CNB, and a second priority lien in the assets pledged to Marine Midland.

CNB's purchase of the assets closed on October 18, 1996 (the entirety of the purchase and sale of the assets of all three entities will be referred to herein as the "Formation Transaction"). As part of the Formation Transaction, in exchange for the assets of Clearing-Niagara, CNB paid the sum of $43,805,838 and assumed various liabilities. Pursuant to written instructions approved ahead of time by all parties to the Formation Transaction, this $43,805,838 was transferred from CNB's account into an account maintained by Clearing-Niagara.

All of these funds were immediately disbursed to other parties (again, pursuant to the previously-approved written instructions), among them Lloyds and Marine Midland. Marine Midland received, *inter alia*, $14,471,480 in satisfaction of a prior loan to Clearing-Niagara, and discharged its first priority security interests in the assets of Clearing-Niagara which were being acquired by CNB. Lloyds received a total of $25,985,569, of which $1.6 million was security for a standby letter of credit issued by Lloyds relating to Clearing-Niagara's obligations regarding its employee stock ownership plan, and the remaining $24,385,569 was transferred into an account owned by Verson, where it was credited against Verson's overdraft credit facility and reduced Verson's debt to Lloyds by that amount. In exchange, Lloyds released its second priority security interest in the assets of Clearing-Niagara being purchased by CNB.

After the closing of the Formation Transaction, CNB did not achieve projections and on March 10, 1999, it filed a Chapter 11 petition under the Bankruptcy Code. An official committee of unsecured creditors was subsequently appointed. While operating as a debtor-in-possession, CNB joined with the committee to file this adversary proceeding. On April 26, 2001, the Bankruptcy Court confirmed a plan of reorganization, which required the formation of the Trust to prosecute this and various other adversary proceedings for the benefit of creditors.

The plaintiffs initiated the present adversary proceeding against several defendants to recover alleged fraudulent conveyances arising out of the Formation Transaction. The plaintiffs subsequently resolved all of the claims except for those against Lloyds.

As for the claims against Lloyds, the Bankruptcy Court held a lengthy trial involving a plethora of complex legal and factual issues. Ultimately, the Bankruptcy Court found that the Formation Transaction constituted a constructively fraudulent conveyance pursuant to New York Debtor and Creditor Laws ("NYDCL") §§ 273 and 274[2] because (i) CNB conveyed approximately $11 million more to various parties than it received in exchange during the Formation Transaction; (ii) CNB was rendered insolvent by reason of the Formation Transaction; and (iii) CNB was left with unreasonably small capital for the business in which it was about to engage following the Formation Transaction. See In re CNB Int'l, 393 BR at 325-27.

The Bankruptcy Court also concluded that Lloyds did not constitute an initial transferee of the funds it received as a result of the Formation Transaction for purposes of Bankruptcy Code § 550(a)(1), but neither did it qualify for the good faith defense of Bankruptcy Code § 550(b) because Lloyds lacked good faith and had knowledge of the constructively fraudulent transfer. The Bankruptcy Court assessed Lloyds' liability at $11,264,000, but offset that amount

---

[2] New York's version of the Uniform Fraudulent Conveyance Act ("UFCA") is codified at N.Y. Debt. & Cred. Law §§ 270-281 (McKinney 2010).

by $625,000 for amounts the Trust had previously received from the settling defendants.  The Bankruptcy Court then imposed prejudgment interest at 2.975 percent, representing an average of the weekly one-year constant maturity Treasury yields for the 392 weeks during which the case was litigated.  Thus, the Bankruptcy Court's imposition of liability against Lloyds totaled $10,639,000 plus $2,372,526.14 in interest, or $13,011,526.14.

Both parties challenge the Bankruptcy Court's determination of liability and the amount of damages assessed.  The Trust challenges the rate of prejudgment interest applied by the Bankruptcy Court.

## DISCUSSION

A. Jurisdiction

"The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."  28 U.S.C. § 158(a)(1).  Section 157 of that title provides that bankruptcy judges may enter orders and judgments regarding core proceedings under the Bankruptcy Code.  See 28 U.S.C. § 157(b)(1).  Core proceedings include "proceedings to determine, avoid, or recover fraudulent conveyances."  See 28 U.S.C. § 157(b)(2)(F).  A final judgment is one where the court has made "a decision upon a cognizable claim for relief" that constitutes "an

ultimate disposition of [a claim]." See Curtiss-Wright Corp. v. General Elec. Co.,

446 U.S. 1, 7 (1980). Jurisdiction lies over this appeal from the Bankruptcy

Court's order finding Lloyds liable for a specific amount on account of a fraudulent

conveyance.


B.  Standard of Review

Findings of fact are reviewed for clear error, while conclusions of law are

reviewed *de novo*.  See, e.g., COR Route 5 Co., LLC v. Penn Traffic Co. (In re

Penn Traffic Co.), 524 F.3d 373, 378 (2d Cir. 2008).  A grant of prejudgment

interest and the rate used if such interest is granted are matters confided to the

bankruptcy court's broad discretion, and will not be overturned on appeal absent

an abuse of that discretion.  Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,

67 F.3d 1063, 1071-72 (2d Cir. 1995).


C.  Initial Transferee Under the Bankruptcy Code

Neither party challenges the Bankruptcy Court's conclusion that the

Formation Transaction constituted a constructively fraudulent conveyance under

NYDCL §§ 273 and 274.  See CNB Int'l, 393 B.R. at 326-27.  Where a

conveyance is fraudulent as to creditors under state law, Bankruptcy Code §

544(b)(1) provides that a trustee in bankruptcy may step into the shoes of such

creditors and avoid the fraudulent conveyance himself.  <u>See</u> 11 U.S.C. §

544(b)(1).  Bankruptcy Code § 550 states that:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.
> (b) The trustee may not recover under section (a)(2) of this section from—
>> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided . . .

11 U.S.C. § 550.

The Bankruptcy Court concluded that Lloyds did not constitute an initial

transferee for purposes of Bankruptcy Code § 550(a)(1).  <u>CNB Int'l</u>, 393 B.R. at

328.  Instead, it found that Clearing-Niagara was the initial transferee, that Lloyds

was a subsequent transferee under Bankruptcy Code § 550(a)(2), and that

Lloyds was ultimately not entitled to the defense of Bankruptcy Code § 550(b)(1).

<u>Id.</u> at 329-31.  The Trust disputes the Bankruptcy Court's determination and

asserts that Lloyds, not Clearing-Niagara, was the initial transferee of funds from

CNB in the Formation Transaction for purposes of Bankruptcy Code § 550(a)(1).

The Bankruptcy Code does not define "initial transferee," and the legislative

history is silent on the issue as well.  <u>See, e.g.</u>, <u>Bonded Financial Services, Inc. v.</u>

European American Bank, 838 F.2d 890, 893 (7th Cir. 1988).  It is accepted that

the first entity in physical possession of funds is not necessarily a "transferee":

> "Transferee" is not a self-defining term; it must mean something
> different from "possessor" or "holder" or "agent."  To treat
> "transferee" as "anyone who touches the money" and then to escape
> the absurd results that follow is to introduce useless steps; we slice
> these off with Occam's Razor and leave a more functional rule.

Id. at 894.

The Second Circuit test for determining whether an entity constitutes an

initial transferee is the "mere conduit" test, which was adopted in Christy v.

Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine,

Underberg, Manley, Myerson & Casey), 130 F.3d 52 (2d Cir. 1997).  Finley,

Kumble held that "a commercial entity that, in the ordinary course of its business,

acts as a mere conduit for funds and performs that role consistent with its

contractual undertaking in respect of the challenged transaction, is not an initial

transferee within the meaning of § 550(a)(1)."  Id. at 57-59.

Finley, Kumble did not provide a general definition for a mere conduit, but

did explicitly adopt the logic of the Seventh Circuit as articulated in Bonded and

its progeny.  Id. at 58.  Bonded is the seminal case on the issue of initial

transferees, and the Fourth, Fifth, Sixth, Ninth, Tenth and Eleventh Circuits have

also adopted some version of the Bonded standard, referred to as the "dominion"

and/or "control" test.  See, e.g., Andreini & Co. v. Pony Express Delivery Serv.,

9

Inc. (In re Pony Express Delivery Serv., Inc.), 440 F.3d 1296, 1300 (11th Cir.

2006); Taunt v. Hurtado (In re Hurtado), 342 F.3d 528, 533 (6th Cir. 2003); Bailey

v. Big Sky Motors, Ltd. (In re Ogden), 314 F.3d 1190, 1202 (10th Cir. 2002);

Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Prop. Ltd. P'ship),

99 F.3d 151, 156 (4th Cir. 1996); Sec. First Nat'l Bank v. Brunson (Matter of

Coutee), 984 F.2d 138, 141 (5th Cir. 1993); Danning v. Miller (In re Bullion

Reserve of N. Am.), 922 F.2d 544, 549 (9th Cir. 1991). The simplest statement of

the dominion and control test from Bonded provides that: "the minimum

requirement of status as a 'transferee' is dominion over the money or other asset,

the right to put the money to one's own purposes." See 838 F.2d at 893.[3]

None of the circuit-level decisions features a transaction completely

analogous to that which was before the Bankruptcy Court, but all are consistent in

applying the concept of legal dominion or control over the funds at issue as

dispositive. See, e.g., Incomnet, 463 F.3d at 1075 (non-profit corporation was the

initial transferee and not a mere conduit of statutorily-mandated contributions

from telecommunications providers where the corporation had some discretion

over the distribution of such funds; "[t]hese legal restrictions merely limit how [the

---

[3]     In Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1 (S.D.
N.Y. 2007), the Southern District suggested that the Second Circuit's mere conduit test
frames Bonded's "dominion and control" test in the negative. Rather than stating that a
party is an initial transferee if it exercises "dominion and control" over the funds, the
Second Circuit's version of the test states that a party is *not* an initial transferee if it was
a "mere conduit" of the funds.

Id. at 14-15. This distinction, though helpful conceptually, does not affect the substance of the
underlying analysis.

initial transferee] will exercise its dominion over the funds; they do not preclude [the initial transferee] from having dominion at all."); Andreini, 440 F.3d at 1302 (insurance broker was not an initial transferee of funds from client to insurance provider despite the broker having paid the provider before the client's check to the broker cleared; "[a]t no time were the transferred funds under the unrestricted legal control of [the broker] . . . . [F]unds could only be used for the client's purposes . . . ."); Hurtado, 342 F.3d at 534-35 (transferor's mother was the initial transferee of funds that she distributed at the transferor's subsequent directions; "[the mother] was not under any legal obligation to follow the [transferor's] directions."); Ogden, 314 F.3d at 1203-04 (escrow company was not an initial transferee where transferor had fraudulently taken funds out of escrow before replacing them after the escrow company discovered the fraud; "the fact that [the escrow company] caused [the transferor] to transfer the disputed funds and received some benefit [i.e., it was no longer subject to breach of fiduciary duty claims by the initial transferee] from this transfer is insufficient to establish that [the escrow company] had dominion and control over those funds."); Bowers, 99 F.3d at 156-57 (corporate management company and its president were not initial transferees where they caused funds from two entities the company managed to be transferred to satisfy a debt on behalf of another corporation owned by the company's president; "[a]t the time the transfers were effected, [the management company and its president] were acting in their representative capacity as

manager . . . . Therefore, neither . . . had the authority to exercise legal dominion and control over the funds."); Coutee, 984 F.2d at 141 (law firm was a mere conduit where it received settlement funds on behalf of clients, a portion of which funds were transferred to a bank to repay a loan, making the bank the initial transferee; "the law firm had no legal right to put the funds to its own use, and thus lacked the requisite dominion required to be the initial transferee."); First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Serv.), 974 F.2d 712, 722 (6th Cir. 1992) (transferor gave check to his agent to apply to the transferor's loan indebtedness at a bank, but the bank told the agent to deposit the check into the agent's account until it cleared, at which point the funds were immediately given over to the bank as the initial transferee; "[t]he fact that the money was temporarily lodged in [the agent's] account does not alter the facts . . . . [I]n law the money was not [the agent's] and he was simply acting at the direction of [the transferor]."); Bullion Reserve, 922 F.2d at 549 (funds were transferred to an individual, who used them to purchase shares of stock in his and his partner's name, which shares were immediately pledged back to the transferor of the funds pursuant to a contract; partner was not a transferee because he "had no dominion over the money, nor could he put the money to his own purposes." (quotations omitted)); Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1200-01 (11th Cir. 1988) (bank was a mere conduit where it received funds from the transferor to cover a paper overdraft in an account

owned by the initial transferee; "there was no real debtor-creditor relationship . . . the bank merely deposited the funds into [the initial transferee's] account, and [the initial transferee] used that money to pay the check [that caused the overdraft.]  When viewed in that manner, [the bank] functioned as a conduit . . . ."); Bonded, 838 F.2d at 893 (bank was not an initial transferee of a check made payable to its order but accompanied by a note instructing the bank to "deposit this check into" a specified account; the bank "held the check only for the purpose of fulfilling an instruction to make the funds available to someone else.").  These cases make clear that Clearing-Niagara is an initial transferee only if it exercised legal dominion and control over the funds from CNB.  See, e.g., Bonded, 838 F.2d at 893.  If not, it was a mere conduit and Lloyds would constitute the initial transferee.  See, e.g., Finley, Kumble, 130 F.3d at 57-59.

This Court agrees with the Trust and finds that Lloyds, not Clearing-Niagara, was the initial transferee of the finds.  Clearing-Niagara was a mere conduit because it never exercised any dominion and control over the $25,985,569 transferred to Lloyds.  See, e.g., Baker & Getty, 974 F.2d at 722; Bullion Reserve, 922 F.2d at 549.  Clearing-Niagara's receipt of those funds in the first instance was conditioned upon their immediate transfer to Lloyds.  (Def.'s Exs. 116 and 117 at Lloyds' App. 5936-45; 5946-49).  Lloyds, not Clearing-Niagara, was the initial transferee of those funds under Bankruptcy Code § 550(a)(1).

Lloyds cites Lowry v. Sec. Pacific Bus. Credit, Inc. (In re Columbia Data Prod., Inc.), 892 F.2d 26 (4th Cir. 1989) in support of its claim that it was not an initial transferee. In that case, the Court stated: "[the initial transferee] used the funds for its own purpose - to reduce its debt to [the subsequent transferee]. The fact that [the initial transferee] could not have used the funds for other purposes does not affect this critical factor." Id. at 29. The initial transferee in Lowry had, prior to the challenged transfer, granted the subsequent transferee a security interest in its accounts receivable, and the subsequent transferee was entitled to all funds which the initial transferee deposited into the subject account. Id. at 27. This, according to Lloyds, is similar to what it asserts was Clearing-Niagara's payment to Lloyds on account of Lloyds' security interest in Clearing-Niagara's assets.

However, the crucial distinction between the Lowry transaction and the Formation Transaction is that the initial transfer from CNB was contractually conditioned upon, inter alia, Clearing-Niagara's immediate transfer of the funds to Lloyds for the release of Lloyds' security interest in Clearing-Niagara's assets which CNB was acquiring; Clearing-Niagara never had any discretion to do anything else with the $25,985,569. (Def.'s Exs. 116 and 117 at Lloyds' App. 5936-45; 5946-49). Put differently, the transferor in Lowry did not care what the initial transferee did with the funds once they left the transferor's possession, see 892 F.2d at 29; at that point the funds were at the discretion of the initial

14

transferee, which discretion the transferee had already exercised by contracting with the subsequent transferee.  See id.; see also Incomnet, 463 F.2d at 1075.  In contrast, CNB, as the transferor, would not have transferred its funds in the first instance if Clearing-Niagara had not been bound to transfer them immediately to Lloyds in exchange for, *inter alia*, the release of Lloyds' second priority security interest in Clearing-Niagara's assets.  (Def.'s Exs. 116 and 117 at Lloyds' App. 5936-45; 5946-49).[4]

For these reasons, for purposes of Bankruptcy Code § 550, Clearing-Niagara constituted a mere conduit and Lloyds was the initial transferee of $25,985,569 from CNB during the Formation Transaction.


D.  Liability under New York Debtor & Creditor Laws

The conclusion that Lloyds constitutes an initial transferee does not end the analysis, however.  Bankruptcy Code § 550(a)(1) provides that a trustee may recover property from an initial transferee "to the extent that a transfer is avoided

---

[4]    This point makes the other authorities cited by Lloyds equally unavailing.  See, e.g., Webster v. E.I. Kane Constr., Inc. (In re NETtel Corp., Inc.), 2004 WL 3130571, *2 (Bankr. D. D.C. 2004) (payment was "compensation to [initial transferee] for work performed by [the initial transferee] (albeit through the use of subcontractors)," such that the initial transferee/contractor was not a mere conduit for payments to subcontractors); Ragsdale v. South Fulton Mach. Works, Inc. (In re Whitacre Sunbelt, Inc.), 200 B.R. 422, 426 (Bankr. N.D. Ga. 1996) (where insider cashed a check to himself from debtor and then wrote a check to another entity to secure release of his guaranty of a debt owed by that debtor, insider "did use [the funds] for his own benefit-to pay off a debt that he personally guaranteed."); Billings v. Key Bank of Utah (In re Granada, Inc.), 156 B.R. 303, 308 (C.D. Utah 1990) ("The partnerships properly exercised control over the funds through . . . their general partner.  [The general partner's] control over the funds was also the partnerships' control over the funds," such that partnerships were not mere conduits).

under section 544 . . . ." 11 U.S.C. § 550(a)(1).  Bankruptcy Code § 544, in turn,

states in relevant part:  "the trustee may avoid any transfer of an interest of the

debtor in property . . . that is voidable under applicable law by a creditor holding

an unsecured claim . . . ." 11 U.S.C. § 544(b)(1).  The applicable law in this case

is the New York Debtor & Creditor Laws.

As stated, the parties do not challenge the Bankruptcy Court's conclusion

that the Formation Transaction constituted a constructively fraudulent

conveyance under NYDCL §§ 273 and 274.  Where a fraudulent transaction has

occurred, NYDCL § 278 delineates the extent of a transferee's liability to a

creditor harmed by such a transaction:

1.   Where a conveyance or obligation is fraudulent as to a creditor, such
     creditor, when his claim has matured, may, as against any person
     except a purchaser for fair consideration without knowledge of the
     fraud at the time of the purchase, or one who has derived title
     immediately or mediately from such a purchaser,

     a.   Have the conveyance set aside or obligation annulled to the
          extent necessary to satisfy his claim, or

     b.   Disregard the conveyance and attach or levy execution upon
          the property conveyed.

2.   A purchaser who without actual fraudulent intent has given less than
     a fair consideration for the conveyance or obligation, may retain the
     property or obligation as security for repayment.

N.Y. Debt. & Cred. Law § 278.

Thus, notwithstanding that a fraudulent conveyance has occurred, a purchaser for fair consideration who takes without knowledge of the fraud has a complete defense to a creditor's attempt to have the conveyance set aside. See N.Y. Debt. & Cred. Law § 278(1). Similarly, a purchaser who does not have actual fraudulent intent but who gives less than fair consideration may retain the property as security for repayment; in effect, such a purchaser is only liable for the difference between the value it conferred to the debtor and the amount it received in exchange. See N.Y. Debt. & Cred. Law § 278(2).[5]

---

[5] The Bankruptcy Court stated that the "damages" in a fraudulent conveyance action under the New York Debtor & Creditor Laws are measured as the difference between the value of the property conveyed and received by the transferor, and that under Bankruptcy Code § 550(a), "[w]hen a defendant has paid some but less than full consideration, that value [recoverable by the trustee] is set as the amount of the inadequacy." CNB Int'l, 393 B.R. at 332. Notwithstanding that these two statements do not have the same meaning, the Bankruptcy Court concluded that where

> CNB paid a consideration that was $11,264,000 greater than the value of assets that it acquired through the formation transaction . . . [t]hat inadequacy of consideration will constitute damages that plaintiffs may recover as a fraudulent conveyance from a proper party defendant.

Id. However, under NYDCL § 278, "where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of the consideration given." Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005), quoting U.S. v. McCombs, 30 F.3d 310, 328 (2d Cir. 1994). Moreover, a transferee's liability under the plain language of NYDCL § 278 is determined by the inadequacy of the value conveyed by the *transferee* in exchange for the property it receives in a fraudulent conveyance, rather than the inadequacy received by the transferor. See N.Y. Debt. & Cred. Law § 278. See Brown v. Kimmel, 414 N.Y.S.2d 226 (2nd Dept. 1979) (plaintiff's claim against transferees of *intentionally* fraudulent conveyance under DCL § 278 is "limited only by the value of the transferred property" without discussing consideration given in return); Langan v. First Trust & Deposit Co., 101 N.Y.S.2d 36 (4th Dept. 1950) (court discusses "damages alleged to have resulted from claimed illegal transfer of bankruptcy assets," not a fraudulent transfer action under NYDCL § 278).

The Bankruptcy Court engaged in this analysis, but it did so consistent with its determination that Lloyds was a subsequent transferee under the Bankruptcy Code and contemplating Clearing-Niagara as the purchaser. See CNB Int'l, 393 B.R. at 331-33. However, just as Lloyds constituted the initial transferee for purposes of Bankruptcy Code § 550, Lloyds is more appropriately viewed as the purchaser under NYDCL § 278 when the Formation Transaction is "collapsed."

"It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under [the New York Debtor and Creditor Laws]." HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995), citing Orr v. Kinderhill Corp., 991 F.2d 31, 35-36 (2d Cir. 1993).

> In equity, substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done. . . . Thus, an allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implication.

Orr v. Kinderhill, 991 F.2d at 35 (internal quotations omitted). "In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction[6] and to whether its components were part of a

---

[6] This knowledge requirement is different than knowledge for the purposes of Bankruptcy Code § 550(b)(1). See CNB Int'l, 393 B.R. at 330-31. Knowledge for purposes of collapsing is knowledge of the multiple, integrated layers of the transaction rather than knowledge of any fraud or voidability. See In re Best Products Co., Inc., 168 B.R. 35, 57 (Bankr. S.D. N.Y. 1994).

single scheme." <u>HBE Leasing</u>, 48 F.3d at 635-36, quoting <u>In re Best Products</u> <u>Co., Inc.</u>, 168 B.R. 35, 56-57 (Bankr. S.D. N.Y. 1994).

In this case, it is beyond dispute that Lloyds had notice of the structure of the entire transaction – indeed, all of the various stages were contemplated and authorized by each of the participants ahead of time. (Def.'s Exs. 116 and 117 at Lloyds' App. 5936-45; 5946-49). Therefore, it is appropriate to collapse the transaction to evaluate Lloyds' liability as the recipient of a fraudulent conveyance from CNB. <u>See</u> <u>Orr v. Kinderhill</u>, 991 F.2d at 35.

The effect of collapsing the Formation Transaction is that CNB transferred $25,985,569 to Lloyds in exchange for (i) a standby letter of credit in the amount of $1.6 million to be drawn, if necessary, to meet obligations regarding Clearing-Niagara's employee stock ownership plan, and (ii) the release of Lloyds' second priority security interest in the assets CNB was acquiring from Clearing-Niagara. (Lloyds' Br. in Supp. of Appeal at 33-34). If these exchanges were for fair consideration and without knowledge of any fraud, then Lloyds has a complete defense to liability for its receipt of the funds. <u>See</u> N.Y. Debt. & Cred. Law § 278(1). Alternatively, if Lloyds gave something less than fair consideration but lacked actual fraudulent intent, it is only liable for the difference between the

amount it received and the value it conveyed.  <u>See</u> N.Y. Debt. & Cred. Law §

278(2).[7]

Fair consideration, as contemplated by NYDCL § 278, is elsewhere defined

in the New York Debtor and Creditor Laws:  "Fair consideration is given for

property . . . [w]hen in exchange for such property . . . , as a fair equivalent

therefor [sic], and in good faith, property is conveyed or an antecedent debt is

satisfied."  N.Y. Debt. & Cred. Law § 272.

> The fair consideration test "is profitably analyzed as follows: (1) . . .
> the recipient of the debtor's property[ ] must either (a) convey
> property in exchange or (b) discharge an antecedent debt in
> exchange; and (2) such exchange must be a 'fair equivalent' of the
> property received; and (3) such exchange must be 'in good faith.'"

<u>Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)</u>,

403 F.3d 43, 53 (2d Cir. 2005), quoting <u>HBE Leasing Corp. v. Frank</u>, 61

F.3d 1054, 1058-59 (2d Cir. 1995).

However, the Second Circuit has previously stated that "[g]ood faith is an

elusive concept in New York's constructive fraud statute.  It is hard to locate that

concept in a statute in which 'the issue of intent is irrelevant.'"  <u>Sharp Int'l</u>, 403

F.3d at 54, quoting <u>U.S. v. McCombs</u>, 30 F.3d at 326 n.1.  Indeed,

---

[7]    Strictly speaking, NYDCL § 278(2) would allow Lloyds to retain the property it received in security for repayment of whatever amount it conveyed.  However, since the property that Lloyds received was simply cash, if Lloyds conveyed less than it received, the more effective remedy is to require Lloyds to return that difference.

Where, as here, a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme. See <u>Atlanta Shipping Corp. v. Chemical Bank</u>, 818 F.2d 240, 249 (2d Cir. 1987); 1 Garrard Glenn, *Fraudulent Conveyances and Preferences* § 295, at 512 (1940) (UFCA requirement of "good faith" refers solely to "whether the grantee knew, or should have known, that he was not trading normally, but that . . . the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors").

<u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 636 (2d Cir. 1995).

This is consistent with the purposes of fraudulent conveyance law (as distinguished from preference actions):

As the definition of "fair consideration" in [NY]DCL § 272 makes clear, even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them."

<u>Id.</u> at 634 (quoting <u>Boston Trading Group, Inc. v. Burnazos</u>, 835 F.2d 1504, 1508 (1st Cir. 1987)); <u>see also</u> <u>Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.</u>, 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816, 819 (1st Dep't 1993).

Thus, for purposes of the New York Debtor and Creditor Laws, where the transferee of a fraudulent conveyance takes property in exchange for value, "and to the extent" that transferee exchanges value, that transfer is excepted "from

avoidance as a fraudulent conveyance under . . . the NYDCL." See Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.), 286 B.R. 546, 580 (Bankr. D. Del. 2002). In other words, to the extent that Lloyds received property from CNB in exchange for value, Lloyds would not have liability as the transferee of a fraudulent conveyance, notwithstanding any arguments as to lack of good faith. See N.Y. Debt. & Cred. Law § 278.[8]

As a result of the Formation Transaction, Lloyds received $25,985,569 in cash in exchange for (i) a standby letter of credit in the amount of $1.6 million to be drawn, if necessary, to meet Clearing-Niagara's obligations regarding its employee stock ownership plan, and (ii) the release of Lloyds' second priority

---

[8] For purposes of NYDCL § 278(2), it is undisputed that Lloyds lacked actual fraudulent intent:

> [T]he language "actual fraudulent intent" under NYDCL § 278(2) has been construed such that it is satisfied if a "transferee participated *or acquiesced* in the transferor's fraudulent design." 13 Romualdo P. Eclavea, *Carmody-Wait 2d New York Practice with Forms* §§ 85-29 & 85-30 (2002) (emphasis added). Participation and/or acquiescence in a transferor's fraudulent design, in turn, has been found to exist if, *inter alia*, a transferee had knowledge of a transferor's fraudulent intent. See id.; In re Deitz' Estate, 196 Misc. 893, 93 N.Y.S.2d 597, 600 (N.Y.Sur.Ct.1949); Berlenbach v. Bischoff, 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930). Accordingly, the language "without actual fraudulent intent" under NYDCL § 278(2) must mean without participation in or knowledge of a transferor's fraudulent scheme . . . .

Foxmeyer Corp., 286 B.R. at 580. Thus, in order for Lloyds to have actual fraudulent intent for purposes of NYDCL § 278(2), the transferor must also have had such intent. See id. But the Bankruptcy Court, prior to this trial, granted a motion for summary judgment as to the Trust's counts that related to intentionally fraudulent conveyances under NYDCL §§ 275 and 276. Therefore, Lloyds cannot have actual fraudulent intent for purposes of NYDCL § 278(2).

security interest in the assets CNB was acquiring from Clearing-Niagara.  (Lloyds'

Br. in Supp. of Appeal at 33-34).[9]

Unfortunately, the value conveyed by Lloyds to CNB when Lloyds released

its second priority security interest in Clearing-Niagara's assets is not discernible

on the existing record.  The Bankruptcy Court did conclude that the business

enterprise value of CNB following the Formation Transaction was approximately

$59 million, see CNB Int'l, 393 B.R. at 324,[10] and it also suggested that the Bliss

assets might have been worth $15 million while the Enprotech assets acquired by

CNB might have been worth $14 million.  Id. at 325.  If those numbers were

correct, then the Clearing-Niagara assets were worth approximately $30 million

($59 million – ($15 million + $14 million)).  Marine Midland held a first priority

---

[9]     As to the former of these exchanges, Lloyds clearly conveyed a fair equivalent for its receipt of $1.6 million in that Lloyds provided a standby letter of credit in that amount   Any argument that Lloyds did not exchange with CNB for the $1.6 million would appear to be without merit, since:

> [W]hen a debtor transfers its property but the transferee gives the consideration
> to a third party, the debtor ordinarily will not have received fair consideration in
> exchange for its property.  However, under the well established doctrine of Rubin
> v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981), the fact that
> the consideration initially goes to third parties may be disregarded to the extent
> that the debtor indirectly receives a benefit from the entire transaction.

HBE Leasing Corp., 61 F.3d at 638.
        Here, CNB received an indirect benefit from the $1.6 million standby letter of credit in that Clearing-Niagara's obligations otherwise became CNB's obligations as a result of the Formation Transaction – if CNB had not paid the $1.6 million to Lloyds during the Formation Transaction, it would still have been liable for that obligation following the Formation Transaction.

[10]   Lloyds' argues that the Bankruptcy Court erred in its adjustment of the discount rate used to determine the business enterprise value of CNB.  The Bankruptcy Court is free, on remand, to consider this contention if it uses the same method to calculate the value of the Clearing-Niagara assets if it so chooses.

security interest in those assets, which it discharged upon receipt of approximately $14.5 million during the Formation Transaction. (Lloyds' Br. in Supp. of Appeal at 33). Based on these estimates, it appears that Lloyds received $24,385,569 in exchange for the release of a second priority security interest which was only worth approximately $15.5 million. If this is the case then, pursuant to NYDCL § 278(2) (and via Bankruptcy Code §§ 544(b) and 550(a)), Lloyds is liable to CNB for approximately $9 million. However, because the precise value to CNB of the second priority security interest released by Lloyds cannot be based upon the existing record, remand to the Bankruptcy Court for that determination is necessary.

E.    Remaining Arguments

The parties have raised additional arguments relating to the Bankruptcy Court's imposition of damages in the first instance which it might be helpful to address prior to remand. First, there is no merit to Lloyds' suggestion that its liability ought to be reduced based upon the percentage[11] of the funds it received as a result of the Formation Transaction. As discussed above, the amount of Lloyds' liability is dependent solely on the value it provided to CNB by releasing its second priority security interest in Clearing-Niagara's assets; any other entity's liability (or lack thereof) is completely independent of Lloyds' liability. Similarly,

---

[11]    Percentage either of the total amount conveyed by CNB, or of the amount conveyed via the Clearing-Niagara portion of the transaction.

Lloyds is not entitled to any "offsets" under Bankruptcy Code § 550(d) for amounts collected by the Trust in settlement with other parties to the Formation Transaction. Under the plain language of that section, "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section." 11 U.S.C. § 550(d). But the amounts recovered by the Trust in settlement from other parties are independent of the amount of Lloyds' liability, in that none of those parties were immediate or mediate transferees of Lloyds as the initial transferee. <u>See</u> 11 U.S.C. § 550(a)(2).

Thus, the amount of Lloyds' liability will be determined solely by subtracting the value Lloyds conveyed to CNB in releasing the second priority security interest Lloyds held in Clearing-Niagara's assets from the $24,385,569 that Lloyds received from CNB during the Formation Transaction. <u>See</u> 11 U.S.C. §§ 544(b), 550(a); N.Y. Debt. & Cred. Law § 278(2).

While the parties do not challenge the propriety of awarding prejudgment interest, or the date from which such interest should be calculated, the Trust contends that the Bankruptcy Court erred by applying a federal rate of interest, rather than the New York statutory rate of interest. The Second Circuit has stated that the rate of prejudgment interest to be applied is reviewed for abuse of discretion. <u>Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.</u>, 67 F.3d at 1071-72, quoting <u>Commercial Union Assurance Co. v. Milken</u>, 17 F.3d 608, 613-14 (2d Cir. 1994), <u>cert. denied</u>, 513 U.S. 873 (1994).

> [D]iscretionary awards of prejudgment interest are permissible under federal law in certain circumstances . . . . [T]he award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO, 955 F.2d 831, 833-34 (2d Cir. 1992) (citations omitted).  "The court must, however, explain and articulate its reasons for any decision regarding prejudgment interest."  Henry v. Champlain Enter., Inc., 445 F.3d 610, 623 (2d Cir. 2006).

In this case, the Bankruptcy Court opined that:

> The right to recover prejudgment interest on a fraudulent conveyance arises from that language in [Bankruptcy Code] § 550(a) which allows a trustee to recover "the value" of the transferred property.  To obtain such value, the plaintiffs need some accommodation for the time value of money.  Prejudgment interest fulfills this purpose.

CNB Int'l, 393 B.R. at 335-36.  The Bankruptcy Court went on to discuss where it found the appropriate federal interest rate, and why it chose to average that rate for "the 392 weeks during which this matter has been litigated."  Id. at 336.  It determined that rate to be 2.975 percent, which the bankruptcy court found "fairly reflects the time value of money."  Id.

Notwithstanding that other courts within the Second Circuit, see, e.g., Geltzer v. Artists Marketing Corp. (In re Cassandra Group), 338 B.R. 583, 599-600 (Bankr. S.D. N.Y. 2006), have applied the New York statutory rate to fraudulent conveyance recoveries under Bankruptcy Code § 544(b)(1), there is support for the imposition of a federal rate in such circumstances. See Lewis v. Harlin (In re Harlin), 325 B.R. 184, 192 (Bankr. E.D. Mich. 2005) ("[T]he Trustee is confusing her ability to bring an avoidance action under [Bankruptcy Code] § 544(b)(1) with the remedies available once a transfer has been avoided. The Trustee obtained her judgment in federal court and her right to interest is controlled by federal law.").

In light of the lack of uniformity in the case law on this issue, and in light of the rational provided by the Bankruptcy Court in support of the rate it imposed, it cannot be said that the Bankruptcy Court abused its discretion in applying a federal rate of prejudgment interest. See U.S. v. McCallum, 584 F.3d 471, 474 (2d Cir. 2009), quoting U.S. v. Lombardozzi, 491 F.3d 61, 78-79 (2d Cir. 2007).


## CONCLUSION

For the reasons set for above, Lloyds' liability is affirmed on alternate grounds, the Bankruptcy Court's award of damages is vacated, and the case is remanded to the Bankruptcy Court for determinations consistent with this opinion.

SO ORDERED.

_s/ Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: September 20, 2010